BERNITZ FURNACE APPLIANCE CO. v. WILSON.*

No. 5642.

Circuit Court of Appeals, Third Circuit.

Aug. 16, 1935.

Opinion Amended and Rehearing Denied Sept. 25, 1935.

Evans, Bayard & Frick, of Philadelphia, Pa. (Harrison F. Lyman, H. L. Kirkpatrick, and Fish, Richardson & Neave, all of Boston, Mass., of counsel), for appellant.

Louis Necho, of Philadelphia, Pa., for appellee.

*Writ of certiorari denied 56 S. Ct. 384, 80 L. Ed. ——.

Before BUFFINGTON and THOMPSON, Circuit Judges, and FAKE, District Judge.

BUFFINGTON, Circuit Judge.

In the court below Bernitz Furnace Appliance Company charged Dillon B. Wilson with infringing patent No. 1,393,606 issued October 11, 1921, to Ernest Bernitz for furnace walls. The bill also charged infringement of patent No. 1,627,349 issued May 3, 1927, to Benjamin H. Snow. On final hearing, that court held both patents invalid, whereupon plaintiff, the owner of both patents, took this appeal. After hearing, we are of opinion the court erred in dismissing the bill.

The aim of the patents in question was to prevent masses of clinkers forming on the refractory walls of superheated furnaces. With the coming of the art of underfeed stoking, where the fuel is mechanically fed at the bottom of the furnace bed, tremendous heat was developed and, as a result, the clinkers formed in the fuel bed became very soft and pliable. The excessive heat also rendered the refractory lining of the furnace walls soft and mushy, with the consequent result that the clinkers of the fire bed and the softened walls of the furnace fused or intermingled with each other, thus forming great masses of clinkers on the furnace walls.

In the case in this court, American Engineering Co. v. Underfeed Stoker Co., 41 F.(2d) 985 [in the District Court, Underfeed Stoker Co. v. American Engineering Co., 35 F.(2d) 32], the grave difficulties that arose from slag formation when underfeed stokers came into existence are set forth. The patent there involved was of a later date than Bernitz', but the opinions of two courts give a full account of the grave problem of clinker formation. The testimony of witnesses —and there is no contradiction thereof —makes unquestioned this serious situation. As a consequence, the plant had to be frequently shut down and the clinkers removed, as, for various reasons not necessary to here set forth, the furnace was prevented from functioning properly if they were not removed. In order to get rid of them, a heavy sledge hammer was put on the end of a long handle and introduced into the shut down furnace through a side opening, and two men at the outer end of the handle, by depressing it, raised the sledge hammer within the furnace to a considerable height and then let it drop on the clinker mass. The effect of this blow was to tear loose parts of the fire brick lining. This mischief continued until Bernitz disclosed his simple remedy. He left interstices between the fire bricks of the furnace side wall and through them blew in atmospheric air under high pressure. Later on, instead of putting interstices between the bricks, he put holes in them and blew the atmospheric air through these holes. The result was that he cooled the side wall bricks quite effectually and thus reduced the temperature of the brick lining and kept the bricks from growing soft and mushy with consequent clinker clinging. While the air he introduced was atmospheric and its coldness was transferred to the bricks and made them immune from melting and fusing with the clinkers, the air, more or less heated by its passage through the bricks, was introduced, not into the top fuel bed, but into the middle of it, and, as air introduced under pressure, whether hot or cold, tended to increase combustion, his plan of using cool air to cool the bricks effected the two purposes of brick cooling and increased fuel combustion in his furnace. Bernitz' whole plan would have failed had he introduced heated air and failed to cool the side wall bricks of the furnace.

The proofs show that Bernitz, who was a workman, developed this plan from his own experience and it was so novel that it did not appeal to those who were skilled in the art. Its success, however, was such as to change preconceived ideas. Subsequently Snow, another workman in the plant, developed the idea of making bricks out of carborundum. The latter was a much more satisfactory refractory substance than the fire-brick usually used in furnaces, but as bricks made of carborundum were eight or nine inches in thickness, they could not be burned to the center in kilns and thus their use was prevented. Snow overcame this difficulty and made possible the use of carborundum by providing a hollow chamber instead of a straight hole through the bricks. The air was blown into this carborundum chamber, and as there were only two inches between the chamber and the side wall of the furnace, he was able to reduce the furnace lining part of the carborundum brick from nine inches to two

444

and a half inches, a size which could be burned throughout in a kiln. The proof is unquestioned in this case that no one solved the clinker problem by the introduction of air into the body of the fire bed but Bernitz.

The patent to Bennett, No. 211,082, issued January 7, 1879, was designed to render combustion more perfect, his claim being "a fuel-consumer wherein the fire-pot is surrounded by an air-heating chamber extending underneath the ash-pit and entered by an air-inducting flue, and perforated .to allow the air to escape from the said chamber into the fire-pot, substantially as and for the purposes specified." It is quite clear that after the advent of the underfeed mechanical stokers no one found any help from Bennett's forty-year old patent in solving the clinker problem. It neither concerned the clinker difficulty incident to underfeed stokers, the tremendous heat developed thereby, nor even the existence of furnace clinker trouble. To this situation may be applied the language of this court .in Skelly Oil Co. v. Universal Oil Products Co., 31 F.(2d) 427, 431, where it was said: "A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit."

While perforations of the sides of a stove fire pot appear in Bennett's construction, the perforations were accidental and were not intended for the purpose of furnace clinker clinging prevention. To them may be applied the language of the Circuit Court in Taylor Burner Co. v. Diamond, 72 F. 182, 185, where it was said: "Nor is Taylor's device anticipated in the gas log or in the burner of the Hewitt patent. While some of the holes in these constructions are inclined, yet such inclination is merely accidental, and was not given for any functional purpose. The holes are made normal to the surface in which they are drilled, and are given a relatively upward or downward inclination to the side they happen upon. Such a construction would be fatal to the efficiency of the Taylor device. Such mere accidental use of some of the features of an invention, without recognition of its benefits, does not constitute anticipation."

In view of all the above, we are of opinion the two patents were valid.

The proofs make clear defendant's infringement. He had been an employee of plaintiff and was familiar with the furnace wall lining or bricks, which embodied the inventions of the patentee, and the character of his sales is such a palpable imitation thereof as to stamp him as an infringer. So holding, the decree below was error and must be replaced by one holding the patents valid and infringed and directing an accounting.